John Hays SMITH

v.

The UNITED STATES.

No. 48974.

United States Court of Claims.

Oct. 2, 1956.

Raymond A. Walsh, Washington, D. C., for plaintiff. Bolling R. Powell, Jr., and Richard H. Speidel, Washington, D. C., were on the brief.

E. R. Weisbender, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

JONES, Chief Judge.

This is a patent suit. Plaintiff claims that certain airplanes used by the Government are infringements of a patent owned by plaintiff relating to wing structures.

The main issue is validity of the patent in suit over prior domestic and foreign patents, and over a prior public use. This issue is factual. United States v. Esnault-Pelterie, 303 U.S. 26, 58 S.Ct. 412, 82 L.Ed. 625. Our findings describe in detail the structures involved.

Application for the patent in suit, entitled "Aeroplane Structure" and known as the Smith patent, was filed April 5, 1929, and letters patent were issued October 31, 1933. Plaintiff is the patentee and sole owner.

Under severe atmospheric conditions, ice tends to form on certain surfaces of an airplane during flight. The effect of such ice in changing the effective contours of an airplane wing, as well as the additional weight of the ice, has long been a recognized problem. Efforts to prevent such ice from forming by the application of oil to the wing surfaces, or by the use of pulsating flexible surface areas, or boots, were known prior to the Smith patent application. A British patent accepted in 1912 disclosed a thermal anti-icing system in which a regulated quantity of hot exhaust gases was directed into metal tubes within an airplane wing.

The stated purpose of the Smith patent in suit is to provide a structure "for maintaining exposed surfaces of the airplane at a temperature above the freezing point" of water, a structure which "also serves as a muffler or silencer for the engine exhaust." The patent further states that the structure disclosed distributes engine exhaust gases into effective heat exchanging relation to the upper wing surface by applying the heat in streaks. A detailed description of the Smith patent disclosure is set forth in our finding 4, which includes a reproduction of the patent drawings.

The record in this case does not show that Smith reduced his alleged inven-

tion to practice prior to the constructive reduction to practice by filing his application for letters patent on April 5, 1929. The record does not show that any licenses under the patent were issued or that the specific structures illustrated have achieved commercial success.

Plaintiff elected to rely upon claims 1, 2, 3, 12, 13, 16, 17, 19, 21, 23, 24, 25, 26, and 27 of his patent. These claims are stated in full in finding 5. Claims 1 and 21 are illustrative of the alleged invention and read as follows:

"1. An aeroplane wing comprising an upper surface and a plurality of substantially parallel heating ducts secured to the undersurface thereof, whereby in effect a substantially continuous body of heated fluid is applied to the undersurface only of said aeroplane surface, said ducts being formed in part by said surfaces.

"21. In an aeroplane having a wing structure comprising upper and lower surfaces; means to heat one of said surfaces by a heating fluid, said means comprising a plurality of ducts in parallel incorporated with and forming part of said surface and spaced one from another whereby the entire surface will be heated owing to linear conduction of heat through the intermediate material of the surface between the spaced means, and manifold means to supply a heating fluid to said first named means."

The claims in suit, when considered in the light of the prior art subsequently discussed, lead us to conclude that the Smith patent is in no sense a pioneer, and that it is directed merely to structures and arrangements already known in the art.

Prior to the Smith application filing date, numerous patents disclosing pertinent subject matter were available to the public as prior art. The more pertinent prior patents are mentioned in findings 14a–o inclusive.

The patents to Sueter, Tolputt, Matthews, Lee, Carousso, Lewis, Alfaro, Koch, Vining, Simon, and Kilgore disclose thermal anti-icing constructions in which hot exhaust gases are utilized to heat airplane wing surfaces. The patents to Thurston, Mummert, et al., Pescara, and Nieuport-Astra, and the publicly used Curtiss Racers include airplane wing radiators not unlike the structure illustrated by the Smith patent. The actual structure used in the Curtiss Racers is discussed in detail in our finding 16.

The Vining patent, application filed May 9, 1928, discloses an airplane wing having an upper surface and a plurality of substantially parallel heating ducts or compartments secured to the undersurface thereof. The Vining ducts or compartments are for the purpose of applying a substantially continuous body or flow of heated fluid (hot exhaust gases) to the undersurface only of the upper wing. The ducts or compartments are formed in part by the sheet metal skin that constitutes the upper wing surface. The Vining structure anticipates the alleged invention defined in Smith claim 1.

Plaintiff urges that ducts are different from compartments. We conclude that an elongated compartment through which a heated fluid flows from an inlet at one end to an outlet at the other end is a duct. The Smith patent does not specify any particular size or proportions for the duct structure.

The Vining patent discloses a manifold to supply a heating fluid to the ducts or compartments as recited in Smith claim 21. Separation or segregation of the ducts one from another is disclosed, for example, in the Lewis patent and in the Neiuport-Astra patent.

The variations in the language used in the several Smith claims in suit, and the additional structural elements recited in certain claims but not included in claims 1 and 21 discussed above, do not in our opinion render such claims valid over the prior art specifically noted in our findings 19–28 inclusive.

Plaintiff urges that the Smith patent construction utilizes a heat flow theory which plaintiff calls uniform forced con-

-vection heat transfer. Plaintiff argues that the only real way such convection can be produced is by the use of an open-ended duct and the avoidance of eddy currents. Such a theory is not disclosed in the Smith patent specifications. The Smith patent discloses the use of a slidable plate to partially close the forward end of the ducts for controlling the fluid flow, and shows ducts of a general U-shape. We conclude that the uniform forced convection heat transfer theory first presented at the trial of this case fails to distinguish the operation of the Smith patent structure from prior art structures such as Vining, Lewis, and Thurston.

■ Whether or not patentable invention exists is essentially a question to be determined in the light of the problem involved, the state of the prior art, and pertinent public uses and knowledge. Wilson Athletc Goods Mfg. Co., Inc., v. Kennedy Sporting Goods Mfg. Co., Inc., D.C., 133 F.Supp. 469.

■ We conclude that each of the several claims in suit is invalid for lack of novelty. The alleged invention was described in prior patents before the invention thereof by the plaintiff. The alleged differences between the subject matter claimed by plaintiff and that taught by the prior patents are of minor character. The subject matter as a whole defined in the claims in suit would have been obvious to a person having ordinary skill in the art, at the time the plaintiff made his alleged invention.

■■ Since we find the patent claims in suit to be invalid, for want of invention, we need not determine whether such claims have been infringed by the defendant. Dow Chemical Co. v. Halliburton Oil Well Cementing Co., 324 U.S. 320, 65 S.Ct. 647, 89 L.Ed. 973. There can be no infringement of invalid claims. James J. Gearon v. United States, 121 F. Supp. 652, 129 Ct.Cl. 315.

Plaintiff's petition will be dismissed.

It is so ordered.

LARAMORE, MADDEN, WHITAKER and LITTLETON, Judges, concur.

### Findings of Fact

The court, having considered the evidence, the report of Commissioner Donald E. Lane, and the briefs and arguments of counsel, makes findings of fact as follows:

1. This is a patent suit arising under the provisions of the Act of June 25, 1910, as amended, now Title 28 U.S.C. § 1498, for the alleged infringement of United States Letters Patent No. 1,932,-681, issued October 31, 1933, upon an application for patent filed on April 5, 1929. The plaintiff is a citizen of the United States, and has been the owner of legal title in and to said patent since its issuance. Said patent has not been involved in litigation prior to this suit. The petition avers that plaintiff is entitled to recover compensation in excess of two hundred million dollars plus interest.

2. The parties agreed at pretrial to a separation of issues for trial, and that the issues of validity of the patent and infringement of the patent by the defendant be first determined upon full proofs, findings of fact, and argument of counsel. At the trial, the record of the testimony of the plaintiff taken under the provisions of Title 28 U.S.C. § 2504, the testimony of expert witnesses and of fact witnesses, and numerous exhibits were offered and received in evidence.

### Patent in Suit

3. The subject matter of the patent in suit relates to apparatus for controlling the temperature at the wings and surfaces of an airplane in order to prevent the formation of layers of ice, sleet and snow, and at the same time to reduce the noise of the airplane engine exhaust. The general subject is thermal anti-icing constructions for airplane wings. The problem of preventing the deposition or formation of ice or snow upon the surfaces of airplanes was known at least as early as 1911. An early British patent, 3331 of 1911, suggested conducting ex-

haust gases from the airplane engine between the wing coverings for preventing the formation of ice thereon.

4. The drawings of the Smith patent in suit are reproduced herewith to facilitate understanding the invention claimed.

Oct. 31, 1933.

J. H. SMITH

1,932,681

AEROPLANE STRUCTURE

Filed April 5, 1929

2 Sheets—Sheet 1

*FIG.1.*

*FIG.13.*

*FIG.12.*

*FIG.2.*

INVENTOR

John Hayes Smith,
By Byrnes, Stebbins & Parmelee
His attorneys.

Oct. 31, 1933.          J. H. SMITH          1,932,681

AEROPLANE STRUCTURE

Filed April 5, 1929          2 Sheets-Sheet 2

FIG.3.

FIG.4.          FIG.5.

FIG.6.

FIG.7.

FIG.8.

FIG.9.          FIG.10.

FIG.11.          INVENTOR

John Hays Smith,
By Byrnes, Stebbins & Brundy
His attorneys.

The plaintiff in prosecuting his patent application before the United States Patent Office described his invention as follows:

Applicant's invention pertains to means for heating the wings of an aeroplane with the exhaust gas coming from the aeroplane engine and thereby prevent the

accumulation of ice thereon. More specifically, the exhaust gas from the aeroplane motor is conducted thru a pipe to the valve 16 Fig. 2 which controls the flow of gas to the different parts of the aeroplane. The valve 16 will be explained more fully at the latter part of the description.

The exhaust gas may flow from the valve 16 thru any one of the pipes as 14, 15, 27 or 43. For purpose of explanation it will be assumed that the valve is open so that the gas may flow thru the pipes 14 and 15. The pipes 14 and 15 lead to the upper wing, Figure 1, where the gas enters a front header 13, Figures 3 and 4. The gas moves from the header 13 into the conduits 12 which run transversely of the length of the wing and are of a U shape, Figure 3. The gas moves to the right Fig. 3 or to the turn in the end of the conduit 12 and then moves to the left and escapes to the atmosphere thru the outlet 18 and hood 19. The disposition of the outlet 18 and hood 19 at the leading edge of the wing, applicant's claims, induces a flow of the gases thru the chambers. The underside of these conduits 12 are insulated at 22, Figure 5 so that the heat from the gases will not pass into the interior of the wing. The space between the conduits is heated by conduction.

The heating means in other parts of the plane are the same as above described and no further description of them will be included. Applicant in Figures 6, 7 and 8 has disclosed other shapes of conduits which are formed with corrugated metal.

The valve 16 which controls the flow of the exhaust gases is shown in Figures 9 and 10. The valve 16 comprises a chamber 32 into which the exhaust gases are conducted. Communicating with the chamber 32 are a series of chambers 36 connected by the ports 37–42. Mounted within each of these chambers is a series plate or butterfly valves 45–50 and hinged on the shaft 51. The control of these valves are by means of a rod 56 and 58 thru the bell-crank lever 58 and rod 59

which is connected to a control handle mounted in the fuselage (not shown). The valve is shown open in full lines in Figure 10 and closed in dotted lines. The series of chambers are connected to the pipes 14, 26, 31, 43, 27, 15 which lead to various parts of aeroplane.

5. At the trial, the plaintiff elected to rely upon claims 1, 2, 3, 12, 13, 16, 17, 19, 21, 23, 24, 25, 26 and 27 of the patent in suit. These claims read as follows:

"1. An aeroplane wing comprising an upper surface and a plurality of substantially parallel heating ducts secured to the undersurface thereof, whereby in effect a substantially continuous body of heated fluid is applied to the undersurface only of said aeroplane surface, said ducts being formed in part by said surfaces.

"2. An aeroplane structure comprising an exposed surface on which deposits of congealed moisture may collect and a plurality of segregated imperforate heating ducts internal to and formed in part by said surface in close proximity thereto and in intimate heat transferring relation thereto, the distance between said ducts being such that all of said surface is maintained at a temperature above freezing by the direct application of heat to said surface by said ducts and by the conduction of heat from said ducts into the portion of said surface lying therebetween.

"3. An aeroplane structure comprising an exposed surface on which deposits of congealed moisture may collect and a plurality of segregated imperforate heating ducts internal to and formed in part by said surface and in class [sic] proximity thereto and in intimate heat transferring relation thereto, the distance between said ducts being such that all of said surface is maintained at a temperature above freezing by the direct application of heat to said surface by said ducts and by the linear conduction of heat through said sur-

face into the portions of said surface lying between the ducts.

"12. An aeroplane structure comprising an exposed surface on which deposits of congealed water may form, and means for preventing the formation of such deposits comprising a plurality of walls cooperating with said surface for defining open ended ducts for gases and in effect dividing said surface into portions supplied with heat from different ducts.

"13. An aeroplane structure comprising an exposed surface, and a plurality of heat ducts for substantially all of said surface formed in part by portions of the material constituting said surface, whereby said surface material constitutes portions of said ducts.

"16. In an aeroplane structure, an exposed surface, and means for preventing the formation of congealed deposits of moisture on said surface comprising a plurality of heating ducts at least in part formed by portions of said surface and spaced from each other, the distance between said ducts being such that the intervening areas of the surface are heated by the conduction of heat through the material of said surface whereby substantially the entire surface is heated by the direct application of heat from said ducts or by conduction of heat therefrom.

"17. In an aeroplane structure, an exposed surface, and means for preventing the formation of congealed deposits of moisture on said surface comprising a plurality of heating ducts spaced from each other, at least one wall of each of which is formed by the material of said surface.

"19. An aeroplane wing comprising upper and lower enclosing sheets, means forming a plurality of parallel spaced heating ducts within said wing, said means including part of the upper sheet and spaced apart from the lower sheet, a common manifold supplying a plurality of said ducts with a heating fluid for the purpose set forth.

"21. In an aeroplane having a wing structure comprising upper and lower surfaces; means to heat one of said surfaces by a heating fluid, said means comprising a plurality of ducts in parallel incorporated with and forming part of said surface and spaced one from another whereby the entire surface will be heated owing to linear conduction of heat through the intermediate material of the surface between the spaced means, and manifold means to supply a heating fluid to said first named means.

"23. The structure as defined in claim 21 wherein said first named means is incorporated in and forms part of said upper surface of said wing structure.

"24. The structure as defined by claim 21 and a selective control valve intermediate said manifold and said first named means whereby the heating fluid may be selectively directed to various portions of said surface.

"25. The structure as defined in claim 21 wherein said ducts forming part of said surface include a corrugated sheet of material secured to said surface at intervals to thereby form passages for the heating fluid.

"26. The structure as defined in claim 21 wherein the first means is thermally insulated from the interior of the wing.

"27. The structure as defined in claim 21 wherein means are disposed in the zone of rarefaction and facing to the rear of the direction of motion of said aeroplane structure for ejecting heating fluid from said ducts."

6. The claims relied on all recite airplane structure comprising an exposed surface or sheet and a plurality of heating ducts formed in part or defined by said surface. Claims 1, 2, 3 and 19 recite

that the ducts are secured to or are internal to the undersurface of the exposed surface. Claims 1, 19, 21 and 23–27 recite that the ducts are parallel. Claims 2, 3, 16, 17, 19, 21 and 23–27 recite that the ducts are spaced from one another. Claims 1, 19, 21 and 23–27 recite the airplane structure as a wing. Claims 2 and 3 specify that the ducts are imperforate and in intimate heat transferring relation to the exposed surface. Claims 19, 21, and 23–27 add a recital of a manifold for supplying a heating fluid to the heating ducts. Claim 24 includes a selective control valve, claim 25 specifies that the ducts include a corrugated sheet, claim 26 specifies that the ducts are thermally insulated from the interior of the wing, and claim 27 includes means facing rearward for ejecting heating fluid from the heating ducts. The claims include various functional statements and *whereby* clauses reciting that the distance between ducts is such that all of the exposed surface is maintained at a temperature above freezing, or reciting that the surface is heated by the direct application of heat, or reciting that the surface line between ducts is heated by linear conduction of heat, or reciting that the surface is in effect divided into portions supplied with heat from different ducts.

7. The Smith patent specification states that the invention provides a construction to distribute engine exhaust gases into effective heat exchange relation to substantially the entire upper wing surfaces and to desired portions of the fuselage.

It states that it provides for discharging the engine exhaust gases in zones of negative pressure to induce the flow of gases through the heating ducts without increasing the back or exhaust pressure on the engine.

It states that the chamber 13 extending across the forward portion of the wing varies in effective width to compensate for the falling off in volume of the exhaust gases delivered to wing areas toward the outer end of the wing.

It states that although the chamber 13 is illustrated at one edge of the wing

2, it is to be understood that the positioning of chamber 13 and the shape and direction of the distributing ducts 12 may be varied as desired.

It states that the ducts 12 terminate in ports 18 in hoods 19 preferably placed near the forward edge of the wing.

It further states that the upper surface 20 of the wing 2 preferably is made of metal such as aluminum and its alloys, and that the heating ducts 12 are formed by welding or riveting metallic troughs to the undersurface of the sheet constituting the surface 20.

8. The Smith patent specification does not disclose or mention sizes of manifolds, chambers, or the heating ducts; does not disclose or mention the temperature range of the exhaust gases or the temperature of heated surfaces necessary to prevent icing, and does not mention or suggest the use of hot air and gases produced by a combustion heater and circulated by pressures produced by a ram air scoop. There is no mention in the Smith patent specification of the theory of uniform forced convection heat transfer, and no mention of the Reynolds Number method of flow analysis.

9. The Smith patent specification does refer to and recognize prior efforts to prevent icing by the application of oil to the exposed surfaces of airplanes, and by the discharge of exhaust gases directly into the hollow body of an airplane wing.

10. A preferred embodiment of the Smith patent construction is illustrated in Figures 1–5, 9 and 10 of the patent drawings. Three modified forms of heating duct constructions are illustrated in Figures 6, 7 and 8, respectively. A modified form of control valve is illustrated in Figure 11, and a modified form of port construction is illustrated in Figures 12 and 13.

11. Claim 1 of the Smith patent may be read in the following manner upon the structures illustrated in Figures 1–5 of the patent drawings:

"An aeroplane wing [3] comprising an upper surface [20 on Figure 5] and a plurality of substantially

parallel heating ducts [12] secured to the undersurface thereof, whereby in effect a substantially continuous body of heated fluid [exhaust gases from engine 7] is applied to the undersurface only of said aeroplane surface [20], said ducts [12] being formed in part by said surfaces [20]."

12. Other claims in suit may be read upon the structures illustrated in a similar manner to that given above for claim 1. The heating ducts 12 are shown secured to and internal to the undersurface of the exposed wing surface 20. The heating ducts 12 are illustrated as parallel. The ducts 12 are shown spaced from one another in Figure 5. The drawings show an airplane wing 3, and show ducts 12 in intimate heat transferring relation to the exposed surface 20. A manifold or header 13 is shown for supplying a heating fluid to the heating ducts 12. The selective control valve recited in claim 24 is illustrated in Figure 3 as slidable plates 12a. Heating ducts formed by corrugated sheets are shown in Figures 6, 7 and 8. The thermal insulation recited in claim 26 is shown by the numeral 22 in Figure 5. The heating fluid ejecting means recited in claim 27 is shown as hoods 19 in Figures 1, 2, 3 and 4, and as hood 24 in the modification illustrated in Figures 12 and 13.

13. There is no evidence that the plaintiff Smith reduced his alleged invention to practice prior to his constructive reduction to practice on April 5, 1929, the filing date of his application for United States Letters Patent.

### Prior Art

14. Disclosures of structures pertinent to the Smith patent construction and prior in date to the April 5, 1929, filing date of the Smith application include the following items arranged by date:

a. British patent 3331 of 1911 to Sueter, accepted February 8, 1912, taught a thermal anti-icing system including leading a regulated quantity of exhaust gases into metal tubes in airplane wings. The stated purpose was to heat the air between the wing coverings to prevent the formation of snow or ice thereon. The exhaust gases were then discharged to the atmosphere.

b. British patent 137,082 to Tolputt, accepted January 8, 1920, suggested the delivery of engine exhaust gases into an airplane wing covered with aluminum alloy sheathing. The exhaust gases were led out of the interior of the wing through vents near the trailing edges of the wing. The specification mentioned silencing the exhaust and acknowledged that anti-icing had been previously proposed. Figures 1 and 2 of the British Tolputt patent are reproduced herewith. Hot exhaust gases from the engine Z pass through the main exhaust pipes Y to radiating manifolds E within the wing skin C'. The hot gases released through apertures $E^x$ in the manifolds E heat the skin C' and pass from the wing through vents $C^x$.

*Fig.1.*

*Fig.2.*

British 137,082 Tolputt

*c.* United States patent 1,650,665 to Thurston, filed May 16, 1921, disclosed a wing-type radiator for aircraft in which a portion of the wing was provided with a corrugated metal skin against a sheet metal plate. This construction provided a plurality of parallel water passages extending from a header in the leading edge to a return header in the trailing edge of the wing. Hot water from the engine water jackets was circulated through the water passages in the wing to cool the

water. The exposed wing surface was heated, and such heating was incidental to cooling the engine coolant.

d. United States patent 1,613,619 to Mummert et al., filed November 29, 1922, disclosed a wing-type radiator similar to that disclosed by Thurston, but constructed in parallel connected sections. The Mummert et al., drawings are reproduced here.

The radiator is formed by a smooth metal sheet and a corrugated metal sheet soldered to one another, the channels of the corrugated sheet extending in a fore and aft direction in the embodiments shown in Figures 6, 7 and 8 reproduced herewith. The outer skin sheet 35 is corrugated. The inner sheet 36 is secured to the skin 35 by soldering. The hot fluid in the ducts between the sheets

FIG. 1.

FIG. 2.

FIG. 4.

FIG. 3.

e. French patent 565,251 to Pescara, published January 23, 1924, taught a wing-type radiator located at the leading edges of the airplane wing. The patent specification mentions that the radiating surface may be smooth or corrugated and be an integral part of the outside wing surface. It further mentions that the heat radiated would heat the air contacting the exposed wing surface.

makes direct contact with the inner surface of the skin 35.

f. British patent 261,232 to Matthews, accepted November 18, 1926, disclosed the idea of extending engine exhaust lines to wing member vents located in regions of relatively negative pressure caused by the shape of a wing member. The resulting sucking action tending to withdraw the exhaust gases from the en-

gine was said to increase the horsepower of the engine.

*g.* French patent 619,852, to Nieuport-Astra, published April 11, 1927, also taught a wing-type radiator in which the wing surfaces are formed by a smooth metal sheet secured to a folded or corrugated sheet by rivets. The two sheets form a plurality of fore and aft passages through which hot water from the engine is circulated to release its heat to air passing over the exposed wing surface.

*h.* United States patent 1,705,126, to Lee, filed June 16, 1927, disclosed a thermal anti-icing system for airplane wings, the system including electrical heating elements mounted in contact with the lower surface of the wings. The patent specification mentioned that the invention also contemplated the use of closed containers connected to utilize the exhaust gases from the engine or to utilize a circulated fluid heated by the engine.

*i.* United States patent 1,703,612 to Carousso, filed July 7, 1927, disclosed a thermal anti-icing system for airplane wings utilizing the heat of the engine exhaust gases. The patent drawings taught that an airplane wing may have baffles 23 and a distribution header 18 within the wing as shown in Figures 4 and 9, or may have an arcuate duct 24 at the leading edge of the wing as shown in Figures 10 and 12. The patent disclosed placement of the exhaust vents either at the high point of the upper skin of the wing or near the trailing edge. Figures 4, 9, 10 and 12 are reproduced here.

A. S. CAROUSSO                    1,703,612

*j.* United States patent 1,715,202 to Lewis, filed December 19, 1927, disclosed a thermal anti-icing system for airplane wings utilizing the heat of the engine exhaust gases. The hot gases are directed through pipe coils secured in the upper portion of the wing, and then are released through a vent directed rearward of the trailing edge of the wing. Figures 1 and 4 of the Lewis patent drawings are reproduced herewith.

Fig 1.

Fig. 4.

J. LEWIS                    1,715,202

*k.* United States patent 1,827,276 to Alfaro, filed December 21, 1927, disclosed a thermal anti-icing system for airplane wings utilizing the hot engine exhaust gases to heat air which is then directed to the interior of the wing. As shown in Figure 2, reproduced herewith, heated air from the longitudinal duct 5 contacts the under side of the wing skin at the leading edge and exits from the wing through rearwardly directed vents 11 and 12.

Fig. 2

H. ALFARO                    1,827,276

*l.* United States patent 1,716,276 to Koch, filed May 9, 1928, disclosed a thermal anti-icing system for airplane wings utilizing hot exhaust gases from the motor. The patented construction includes a plurality of partitions 19′ within the wing to equally distribute the hot gases admitted thereto by a system of control valves. The gases are vented from the trailing edge of the wing through ports 79. Figure 2 of the Koch patent is reproduced herewith.

Fig. 2.

C. KOCH        1,716,276

*m.* United States patent 1,821,776 to Vining, filed May 9, 1928, also disclosed a thermal anti-icing system for airplane wings by means of hot exhaust gases from the engine. Figures 1, 2, 6 and 7 of the Vining patent are reproduced herewith.

Referring to Figures 1 and 2, hot exhaust gases from the engine 15 pass through the valved pipe 14 into a compartment 9 extending along and within the leading edge 10 of the wing 8. The upper portion of the interior of the wing is divided into a plurality of fore and aft ducts 11. The wing skin 8, as shown in Figure 1, forms the upper part of the duct 11. Apertures 12 in the rear wall 59 of the compartment 9 admit the hot gases into the parallel ducts 11. Exhaust vents 13 near the trailing edge of the wing are provided with control valves 34. The ducts 11 are parallel but are not spaced from one another. The modified construction illustrated in Figures 6 and 7 of the Vining patent includes a separate distribution duct 51 directing hot gases into the parallel ducts 50 and extending around the leading edge 10 of the wing. The ducts 50, like the ducts 11, are formed in part by the wing skin 8.

*n.* United States patent 1,783,590 to Simon, filed August 14, 1928, also disclosed a thermal anti-icing system for airplane wings utilizing the hot exhaust gases as well as the hot water in the cooling system. The construction shown in Figures 8–10 of the Simon patent includes a longitudinal exhaust gas duct in the leading edge of the wing with exhaust vents therefor at the wing tips, and includes hot water ducts within the wing rearward of the exhaust gas duct. The Simon patent taught the use of heat insulation on the heating duct to force radiation toward the exposed wing surface and away from the interior of the wing.

*o.* United States patent 1,861,477 to Kilgore, filed April 5, 1929, the same filing date as that of the Smith patent in suit, also disclosed a thermal anti-icing system for airplane wings. The Kilgore construction includes heating elements spaced along the length of the wing. The heating elements were disclosed as electrical wires positioned in metal compartments, the upper surface of the compartment forming part of the upper skin of the wing. The lower sides of the heating compartments were covered with heat insulating material to prevent the dissipation of heat to the interior of and to the lower surface of the wing. The Kilgore specification suggested the passing of exhaust gases or other heating fluids through the heating compartments to effectually prevent the formation of ice and snow on the upper wing surface from the leading edge rearwardly. The evidence shows that Kilgore conceived and disclosed to others the subject matter of his patent at least as early as February 1, 1929.

15. Airplanes known as Curtiss Racers were manufactured for and sold to the defendant in 1922, and in a few years shortly thereafter. These Curtiss Racers were equipped with metal wing radiators formed in part by the skin of the leading edge and upper surfaces of the wings. Curtiss Racers so equipped were flown in publicly performed speed races in the United States, and new world speed records were established by such racers in the Pulitzer Trophy races in 1923 and 1925. A wing from one of said racers is defendant's exhibit 46, and a section cut from the leading edge thereof is defendant's exhibit 47. The structure of said section is illustrated by a detail drawing, defendant's exhibit 44, reproduced herewith.

16. Referring to the Curtiss Racer wing section illustration, the metal wing radiator extended rearward from the leading edge 3, and included a plurality of parallel spaced ducts defined by the corrugated skin sheet 86 and an inner sheet 87 secured thereto. Flow arrows marked 12, 90 indicate the direction of water flow through the parallel ducts. An inlet header or manifold 13 was provided within and extending along the leading edge 3 and forward of the partition marked *a*. Hot water from the manifold 13 passed into the forward end of the spaced ducts as indicated by the arrows *b* and *c*. Hot water from the engine water jackets was conducted to the manifold 13 by connecting ducts, and a similar manifold was provided near the trailing edge of the wing to collect the cooling water for return to the engine

jackets. During flight, the hot water which was circulated through the wing radiator was at a temperature of the order of 170–182° Fahrenheit at the entrance manifold 13, and the temperature of the outer skin 86 was maintained well above the temperature at which water congeals to form ice. The Curtiss Racer wing radiator is similar to that shown in the Thurston patent mentioned in finding 14c, and issued to Curtiss Aeroplane and Motor Company, Inc., manufacturer of the Curtiss Racers. The success of the Curtiss Racers equipped with wing radiators in various speed trophy races was publicized in various aviation publications issued in the period 1923–27. There is no evidence in this suit to prove that the Curtiss Racers were actually flown during atmospheric conditions conducive to forming ice or snow on the exposed surfaces of the airplane, or to prove that the wing radiators actually did prevent the formation of such deposits.

the rate of flow and the type of flow. That such heated fluids could be utilized to heat the surface of an airplane wing to temperatures above the temperature at which water congeals to ice was known prior to April 5, 1929, the filing date of the Smith patent in suit.

18. The Smith patent claims in suit relate solely to structure. They do not relate to nor do they cover methods of thermally preventing icing. Smith presented a number of method claims in his application and in amendments thereto. The method claims were consistently rejected by the Patent Office examiner, and the plaintiff abandoned all his claims to the alleged method invention by his cancellation of such claim before his application was allowed. The structures recited in the several claims in suit were taught and disclosed by one or more of the several prior patents noted in findings 14a–o inclusive.

WING SECTION CURTISS RACER

SOLDER

Fig. 1.

Def'ts. Ex. 44

17. Hot air heated by a combustion heater or by a heat exchanger, hot water heated by a jacket on an engine, and hot exhaust gases from an engine are all heated fluids. The quantity of heat provided by the circulation of such a heated fluid through a duct or radiator system depends primarily upon the nature of the fluid, the relative temperature thereof,

The prior patents noted in finding 14 which were not mentioned by the Patent Office during the prosecution of the Smith patent application are Sueter, Thurston, Mummert et al., Pescara, Nieuport-Astra, Lee, Alfaro, Vining and Kilgore.

19. Claim 1 of the Smith patent reads in terms on the structure shown in the Thurston patent, the Mummert et al.,

patent, the Pescara patent, or the Lee patent. Claim 1 recites a wing structure comprising an upper surface and a plurality of substantially parallel ducts secured to the undersurface thereof, said ducts being formed in part by said surface. The wing radiator structures taught by Thurston, Mummert et al., and Pescara, provide a wing structure comprising an upper surface and a plurality of substantially parallel ducts secured to the undersurface thereof, the ducts being formed in part by said surface. The wing anti-icing structure taught by the Lee patent includes an upper surface and a series of heating units in containers secured to the undersurface of the wing. The Lee patent specification states that the containers may be adapted to utilize exhaust gases or a circulated fluid to heat the wing surface to prevent ice accumulation on the surface. The Thurston, Mummert et al., Pescara, and Lee patents were not cited by the Patent Office examiner in his examination of the Smith application for letters patent. Claim 1 does not define patentable invention over the prior art and is invalid.

20. Claim 2 of the Smith patent also reads in terms on the structure shown in the Thurston patent, the Mummert et al., patent, the Pescara patent, or the Lee patent. Claim 2 recites airplane structure comprising an exposed surface and a plurality of segregated imperforate heating ducts internal to and formed in part by said surface, and defines the distance between ducts only in functional terms. The airplane structures taught by the Thurston, Mummert et al., Pescara, and Lee patents provide the structure recited in claim 2. The ducts provided by the wing radiator constructions are of necessity imperforate. The Lee thermal anti-icing patent mentions *closed* containers in referring to the use of exhaust gases or circulated fluids. Claim 2 does not define patentable invention over said prior art and is invalid.

21. Claim 3 recites the same structure as claim 2, and adds in the functional clause that heat is conducted to portions of the surface between the ducts by *linear* conduction. As stated in finding 20, the structures taught by the Thurston, Mummert et al., Pescara, and Lee patents provide the structure recited in the claim. Heat is conducted to portions of the surface between the heating passages or heating elements of the mentioned patents by linear conduction. Claim 3 does not define patentable invention over said prior patents and is invalid.

22. Claim 12 recites an airplane structure comprising an exposed surface and means comprising a plurality of walls cooperating with said surface for defining open ended ducts. This recital reads in terms on the structures shown in the Thurston patent, the Mummert et al., patent, and the Pescara patent. There is no patentable invention in directing heated fluids such as heated air or hot exhaust gases through the hot water passages taught by the wing radiator patents, particularly in view of the teaching in the Lee patent of the equivalency of exhaust gases and circulated fluids heated by the engine. Claim 12 does not define patentable invention over said prior patents and is invalid.

23. Claim 13 recites an airplane structure comprising an exposed surface and a plurality of heat ducts for substantially all of the surface and formed in part by the material of the surface. This recital reads in terms on the prior structures disclosed in the Mummert et al., patent, the Pescara patent, and the Lee patent. The recital of *substantially all* of the surface may be interpreted as meaning substantially all of the surface upon which ice and snow might form, and not as meaning substantially all of the wing surface in its entirety. The Mummert et al., and Pescara constructions provide a plurality of heat ducts formed in part by the material of the surface or skin material. Claim 13 is invalid over the prior patents.

24. Claim 16 is a subcombination claim reciting "In an aeroplane structure, an exposed surface, and means * * *" comprising a plurality of heating ducts at least in part formed by portions of the surface and also spaced from

each other a distance defined functionally. This recital reads in terms on the structures taught by the Thurston patent, the Mummert et al., patent, the Pescara patent, and the Lee patent. Claim 16 differs from claim 12 mainly in the recital of the spacing of the ducts. The hot water passages in the Thurston and Mummert et al., structures, and also as shown in Figures 7 and 8 of the Pescara construction, are spaced each from the other, the distance between the passages being such that the intervening areas of the surface would be heated by the conduction of heat through the surface material. Claim 16 is invalid over the teachings of the prior patents.

25. Claim 17 is like claim 16 with less functional recital, and specifies an exposed surface and a plurality of spaced heating ducts, at least one wall of each duct being formed by the material of the surface. This recital also reads in terms on the structures shown in the Thurston, Mummert et al., Pescara, and Lee patents. Claim 17 is invalid over the disclosures of said patents.

26. Claim 19 recites an airplane wing comprising upper and lower enclosing sheets, means forming a plurality of spaced heating ducts within said wing, said means including part of the upper sheet and spaced apart from the lower sheet, and a common manifold. This recital reads in terms on the structures taught by the prior Thurston, Mummert et al., and Pescara patents. Each of these patents discloses spaced passages within the wing and including part of the upper wing skin, the upper ducts being spaced from the lower wing skin, and discloses a common manifold. Claim 19 is invalid over the prior patents.

27. Claim 21, and claims 23 and 25 dependent thereon, recite "In an aeroplane having a wing structure comprising upper and lower surfaces," means comprising a plurality of ducts in parallel incorporated with and forming part of one surface and spaced one from another, and manifold means. Claim 23 adds that the duct means is incorporated in and forms part of the *upper* surface.

Claim 25 adds that the ducts include a *corrugated* sheet secured to the surface at intervals. These claims read in terms on the structures disclosed in the prior patents to Thurston, Mummert et al., and Pescara. The prior structures include a plurality of ducts forming part of both upper and lower surfaces, the ducts being defined by a corrugated sheet secured to a smooth sheet at intervals. While the plaintiff's patent shows the corrugated sheet on the under or inner side of the supper surface sheet and the prior patents noted above show the corrugated sheet on the outer side of the smooth sheet, the language of claims 21, 23 and 25 is broad and reads in terms on both structures. Claims 21, 23 and 25 are invalid over the prior structures.

28. Claims 24, 26 and 27 are claims dependent on claim 21. Claim 24 adds the selective control valve between the manifold and the heating duct. The Vining patent noted in finding 14m disclosed a series of valves 34 for controlling the flow of exhaust gases through the ducts 11. The Sueter patent noted in finding 14a mentioned provision for regulating the quantity of exhaust gases used and for controlling their admission to and flow through the various spaces to be heated. It is not patentable invention to modify the structures disclosed in the Thurston, Mummert et al., and Pescara patents to provide a valve between the manifolds and the ducts, in view of the teachings of the Vining or the Sueter patent. Claim 26 adds that the heating ducts are thermally insulated from the interior of the wing. The Simon patent noted in finding 14n taught the use of heat insulation on the inner side of a heating duct to force the radiation of heat toward the exposed wing surface and away from the interior of the wing. It is not patentable invention to modify the structures disclosed in the Thurston, Mummert et al., and Pescara patents by adding heat insulation as taught by Simon. Claim 27 adds an ejecting means disposed in a zone of rarefaction and facing rearward. The Tolputt patent noted in finding 14b dis-

closed exhaust gas vents $C^x$ in the zone of rarefaction near the trailing edge of the wing. The Alfaro patent mentioned in finding 14*k* disclosed in Figure 2 an opening 12 for ejecting exhaust gases from the wing, the opening 12 being disposed in a zone of rarefaction and facing rearward.

Claims 24, 26, and 27 are invalid over the prior structures shown in the Thurston, Mummert et al., and Pescara patents, in view of the teachings of the Vining, Sueter, Simon, Tolputt, or Alfaro patents, as set forth above.

29. The prior public use of the wing radiator structure in the Curtiss Racers mentioned in finding 15 is applicable to anticipate and invalidate the claims in suit in the same manner as the structure taught by the Thurston and Mummert et al., patents specifically applied to the claims in findings 19–28 inclusive.

30. The Vining patent noted in finding 14*m* disclosed a thermal anti-icing wing structure which clearly responds in terms to claims 1, 12, and 13 of plaintiff's patent. It would have been obvious in 1929 to anyone skilled in the aircraft construction art to separate the Vining ducts 11 in a lateral direction in view of the teachings of the Pescara patent, the Koch patent, or the Thurston patent. The Vining structure so modified to separate the ducts clearly responds in terms to claims 2, 3, 16, 17, 19, 21, 23 and 25 of plaintiff's patent. Likewise it would have been obvious to move the control valves of the Vining structure forward to control the openings 12 instead of the openings 13, as recited in claim 24 of plaintiff's patent. It would not have required invention in 1929 to add heat insulation to the underside of Vining ducts 11 as recited in claim 26 of plaintiff's patent, nor to add the ejecting hoods 11 and 12 of Alfaro to the Vining structure as recited in claim 27 of plaintiff's patent.

Claims 1, 2, 3, 12, 13, 16, 17, 19, 21, 23, 24, 25, 26 and 27 of plaintiff's patent are invalid over the Vining patent disclosure and obvious modifications thereof.

31. The parties have stipulated that the testimony of the plaintiff, John Hays Smith, taken by deposition in 1949 by defendant, constitutes his testimony on the merits in this case. The plaintiff was not recalled to testify during the trial. The parties have stipulated as final findings of fact several paragraphs concerning plaintiff's citizenship, title to patent, education, employment, experience, and qualifications as an expert, as well as a statement concerning prior attempts to prevent the formation of ice on aircraft. Said paragraphs are included in full on pages 5–11 inclusive of the stipulation filed September 22, 1954, and are incorporated herein by reference only.

32. Summarizing all of the foregoing findings, claims 1, 2, 3, 12, 13, 16, 17, 19, 21, 23, 24, 25, 26 and 27, of plaintiff's patent being all the claims in suit, are invalid over the disclosures of prior patents and the prior public use of Curtiss Racer aircraft.

## Conclusion of Law

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is not entitled to recover, and the petition is therefore dismissed.